IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SUSAN SPITZ, an individual, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 11 C 3997 |
| | ) | |
| PROVEN WINNERS NORTH | ) | |
| AMERICA, LLC, a California | ) | |
| limited liability company, and | ) | |
| EUROAMERICAN | ) | |
| PROPAGATORS, LLC, | ) | |
| a California limited liability company, | ) | |
| | ) | |
| Defendants. | ) | |

# OPINION AND ORDER

## I. INTRODUCTION

Plaintiff Susan Spitz claims defendants Proven Winners North America,
LLC ("PW") and EuroAmerican Propagators, LLC ("Euro") contracted with her to
use her "Marketing Concept" related to pet-safe plants and thereafter used the
Concept, but failed to pay her any fee. In the Second Amended Complaint
("SAC"), plaintiff describes her Marketing Concept as follows:

74. In brief summary, Ms. Spitz conceived and proposed that a plant cultivation, marketing and distribution company or associated companies, such as for example PW and the PW Owners, would benefit substantially by collectively branding through selective tagging, labeling and/or other designation, specific ornamental plant varieties that had been established through testing to be nontoxic to pets, and which plant varieties could therefore be marketed, advertised and sold as "Pet Friendly" or "Pet Safe" or other similar term (Ms. Spitz's "Marketing Concept").

75. The fundamental aspect of Ms. Spitz's Marketing Concept was the concept of marketing, advertising and selling ornamental plant varieties determined to be nontoxic to pets by collectively tagging, labeling and/or otherwise designating such plant varieties as "Pet Friendly" or "Pet Safe" or other similar term. ("Key Aspect").

SAC ¶¶ 74-75 [Docket Entry ("D/E") 101].

Although originally asserting federal Lanham Act claims, the presently

pending SAC is limited to state law claims.[1]  Plaintiff's claims are:  (I) Breach of

---

[1]The SAC failed to provide sufficient allegations supporting diversity jurisdiction, including by failing to properly allege the citizenship of defendants, which are both limited liability companies ("LLC").  A recently filed supplement [D/E 220] establishes that there is complete diversity of citizenship.  *See also* Order dated June 27, 2013 [D/E 219].  Surprisingly, contrary to the allegations of the SAC and uncontested facts stated in the parties' summary judgment fact statements, two of the three members of PW are actually corporations not LLCs. Examination of state records available on the Internet are consistent with the present assertions that these entities are corporations and not based in Illinois. Plaintiff should have been more careful in drafting its allegations of diversity jurisdiction and defendants should have been mindful of the inaccuracies.

2¢ Per Plant Contract for any plant having a label marked "pet friendly" or "pet safe;" (II) Breach of an alleged Pet Friendly Project joint venture Agreement which provided for unstated additional compensation for a Marketing Concept based on identifying "non-toxic" plants as "pet friendly" ( as contrasted with Count I that only pertains to an alleged contract to pay a 2¢ royalty for each plant labeled as" pet friendly" or "pet safe"); (III) Breach of Fiduciary Duty; (IV) Breach of Confidentiality; (V) Breach of Confidentiality and Nondisclosure Agreement by EuroAmerican; (VI) Misappropriation of Trade Secret; (VII) *Quantum Meruit* (In the Alternative); and (VIII) Unjust Enrichment (In the Alternative).  Defendants have each moved for summary judgment dismissing all counts.  Plaintiff has moved for summary judgment dismissing all of PW's and most of Euro's affirmative defenses.  Plaintiff's motion need only be considered to the extent her claims survive defendants' summary judgment motions.

## II. SUMMARY JUDGMENT STANDARDS

On a motion for summary judgment, the entire record is considered with all reasonable inferences drawn in favor of the nonmovant and all factual disputes resolved in favor of the nonmovant.  ***Crawford v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.***, 555 U.S. 271, 274 n.1 (2009); ***Malen v. MTD Prods., Inc.***,

628 F.3d 296, 303 (7th Cir. 2010); *Stokes v. Bd. of Educ. of City of Chicago*, 599 F.3d 617, 619 (7th Cir. 2010). The burden of establishing a lack of any genuine issue of material fact rests on the movant. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010); *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001). The nonmovant, however, must make a showing sufficient to establish any essential element for which she or it will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010). The movant need not provide affidavits or deposition testimony showing the nonexistence of such essential elements. *Celotex*, 477 U.S. at 324; *Freundt v. Allied Tube & Conduit Corp.*, 2007 WL 4219417 *2 (N.D. Ill. Nov. 29, 2007); *O'Brien v. Encotech Constr.*, 2004 WL 609798 *1 (N.D. Ill. March 23, 2004). Also, it is not sufficient to show evidence of purportedly disputed facts if those facts are not plausible in light of the entire record. *See Lorillard Tobacco Co. v. A & E Oil, Inc.*, 503 F.3d 588, 594-95 (7th Cir. 2007); *Yasak v. Ret. Bd. of Policemen's Annuity & Benefit Fund of Chicago*, 357 F.3d 677, 679 (7th Cir. 2004); *Lampley v. Mitcheff*, 2010 WL 4362826 *6 (N.D. Ind. Oct. 27, 2010). As the Seventh Circuit has summarized:

> The party moving for summary judgment carries the
> initial burden of production to identify "those portions of the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Logan v. Commercial Union Ins. Co.*, 96 F.3d 971, 978 (7th Cir. 1996) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986) (citation and internal quotation omitted)). The moving party may discharge this burden by "'showing'--that is, pointing out to the district court--that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325, 106 S. Ct. 2548. Once the moving party satisfies this burden, the nonmovant must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "The nonmovant must do more, however, than demonstrate some factual disagreement between the parties; the issue must be 'material.'" *Logan*, 96 F.3d at 978. "Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute." *Id.* (citation omitted). In determining whether the nonmovant has identified a "material" issue of fact for trial, we are guided by the applicable substantive law; "[o]nly disputes that could affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." *McGinn v. Burlington Northern R.R. Co.*, 102 F.3d 295, 298 (7th Cir. 1996) (citation omitted). Furthermore, a factual dispute is "genuine" for summary judgment purposes only when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505 (1986). Hence, a "metaphysical doubt" regarding the existence of a genuine fact issue is not enough to stave off summary judgment, and "the nonmovant fails to demonstrate a genuine issue for trial 'where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party . . . .'" *Logan*, 96 F.3d at 978 (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348 (1986)).

***Outlaw***, 259 F.3d at 837.

Discovery has been protracted and excessive. Analysis has been made complicated by numerous unnecessary filings under seal. Both sides object that the other side has violated Local Rule 56.1 by asserting multiple facts in individual statements and thereby exceeding the paragraph limit for fact statements. There are also contentions regarding briefs exceeding page limits. No fact statement or brief will be stricken. As long as the facts are presented in a manageable form, this bench generally will exercise its discretion to not strictly enforce the requirements of Local Rule 56.1. *See **Banaei v. City of Evanston***, 2012 WL 4892414 *2 (N.D. Ill. Oct. 11, 2012); *see also **Trade Fin. Partners, LLC v. AAR Corp.***, 573 F.3d 401, 409 (7th Cir. 2009); ***Bordelon v. Chicago Sch. Reform Bd. of Tr.***, 233 F.3d 524, 527 (7th Cir. 2000). In a number of paragraphs of her Rule 56.1(b)(3)(B) response, however, plaintiff has asserted many additional and extraneous facts that should have instead been set forth in plaintiff's Rule 56.1(b)(3)(C) statement of additional facts, for which defendants would have provided a direct response. Asserting additional facts in a Rule 56.1(b)(3)(B) response is not prohibited if responsive to the fact asserted by the opponent and in support of the denial of that

asserted fact. Additional facts that are extraneous, however, must be separately stated in the Rule 56.1(b)(3)(C) statement of additional facts. ***Levin v. Grecian***, 2013 WL 2403642 *1 (N.D. Ill. May 31, 2013). Local Rule 56.1 expressly provides that the movant must respond to the nonmovant's Local Rule 56.1(b)(3)(C) statement of additional facts, lest those facts be taken as true for purposes of summary judgment. Contrary to defendants' contentions, though, nothing in Local Rule 56.1 prohibits the movant from also responding to the nonmovant's Rule 56.1(b)(3)(B) statement and this bench's experience is that parties often so respond. Still, Local Rule does not require that the nonmovant respond to the Rule 56.1(b)(3)(B) statement and defendants have not.[2] Plaintiff makes following her narrative more difficult by not reciting her additional facts in her own Rule 56.1(b)(3)(C) statement nor providing a clear factual presentation in her briefs. No parties' motion to strike is being granted, but improperly asserted extraneous facts cannot support a genuine factual dispute.

Plaintiff complains that the court's denial of her discovery motions to require the details of defendants' business arrangements with Karen Platt and John

---

[2]Defendants will not be granted leave to respond to plaintiff's Rule 56.1(b)(3)(B) statements. If they had wanted to so respond, they should have included such responses with their replies; leave to file them was not required.

Greenlee in order to demonstrate the authority of Joshua Schneider to negotiate contracts on behalf of Amerinova Properties, LLC ("Amerinova") prejudiced her defense of defendants' summary judgment motions. However, today's ruling does not rest on any lack of evidence showing Schneider's apparent authority to negotiate or contract on behalf of Amerinova.

## III. DEFENDANTS' SUMMARY JUDGMENT MOTIONS

### A. Facts

The facts in this case require a consideration of marketing practices and the terminology used in the plant or horticultural industry. Resolving all genuine factual disputes and drawing all inferences in plaintiff's favor, the facts assumed to be true for purposes of ruling on defendants' motions for summary judgment are as follows.

Plaintiff, who is now retired, has worked as a freelance copywriter in the field of horticulture. She described herself as a Marketing Creative Director and Senior Copywriter. She has written material for PW's Gardener's Idea Books and an article on pet-safe plants appearing in another publication that was listed on PW's website.

Euro is a California LLC with its principal place of business in California. Its two members, John Rader and Gerald Church, who are citizens of California, own equal shares. Euro's primary business is to propagate plants and distribute them to plant brokers who sell them to commercial growers.

PW is also a California LLC. Its three members own equal shares. They are: Euro; Four Star Greenhouse, Inc., a Michigan corporation with its principal place of business in Michigan; and Pleasant View Gardens, Inc., a New Hampshire corporation with its principal place of business in New Hampshire. PW is a branding and marketing company that purchases from plant propagators, labels the plants, and distributes Proven Winners and Proven Selections brand plants nationally. Except for their joint interest in marketing the Proven Winner and Proven Selection brands, the members are in competition with each other. They have entered into an operating agreement which controls the activity of PW, particularly requiring the members' consent for entry into marketing contracts such as the kind claimed by plaintiff.

Non-party Amerinova, a California LLC, is owned by its members, Rader and Church. Amerinova negotiates licensing and royalty agreements with plant breeders to bring plants to the consumer market on behalf of breeders.

Amerinova works with companies other than Euro and PW. Plaintiff's contacts with respect to her claimed Marketing Concept were principally with a representative of Amerinova. Plaintiff claims that there is no entity distinction between Euro and Amerinova, which are both owned by Rader and Church. While there is some evidence of commingling of funds and overlap of responsibility, plaintiff does not present sufficient evidence establishing that the distinctions between the two entities should be ignored.

From 2000 until sometime in 2004, Joshua Schneider was the Director of Marketing and Advertising for Euro. From 2004 until March 2006, he was the Director of Product Development for Amerinova. Schneider was authorized to negotiate contracts on behalf of Amerinova, but Rader and Church generally had to approve the contracts and would sign the written contract. There is, however, disputed evidence that must be resolved in plaintiff's favor supporting that sometimes Schneider would complete and sign off on contracts without obtaining Rader's and Church's approval and without the contracts being subsequently rejected or formally ratified by Rader and Church. Also, there is evidence supporting that, on a number of occasions, Amerinova contracts would be orally agreed upon and never subsequently reduced to writing.

Euro has its own website separate from PW. Euro's website used the domain name pweuro.com, with the pw being chosen because of the relationship with PW. Euro's website has a link to PW's website as does PW's website to Euro's website.

As the marketing arm of its three members for particular brands, PW is a company with its own employees, business records, and offices at a location in a different place from Euro, Amerinova, Rader, or Church. It has its own marketing, product development, and program management teams.

Decisions of PW were subject to the approval of its three members. Breeders bring new plant materials to PW for testing and trials. PW staff determines which plants to recommend to its members as PW plants. All three members must agree for a plant to be marketed as a PW plant. At times Euro and Amerinova would recommend that particular plants be considered for the PW designation. Such plants would still have to be recommended by the PW staff and approved by all three members. PW's marketing efforts are supported by marketing fees that are part of the costs of plants. The price of every plant line includes royalties, marketing fees, and tag costs ("RMT"). The royalty goes to the breeder; the marketing fee to PW; and tag costs to the propagator.

In 2001, Schneider, on behalf of Euro, retained plaintiff and Ron Walder to improve Euro's marketing efforts. Schneider suggested to Marshall Dirks, PW's Director of Marketing and Public Relations, that the two might also be of assistance to PW. Beginning in 2001 for Euro and 2002 or 2003 for PW, plaintiff produced copy for the two entities. In 2005, plaintiff stopped accepting copy assignments from the two entities except for one project for PW in late 2008 or early 2009.

In 2003, PW produced its first Gardener's Idea Book. It was a collaborative effort between plaintiff, Walder, and Dirks, with Dirks providing overall project direction. The same three produced the 2005 Idea Book, with work beginning at the end of 2004 and the book being distributed in Spring 2005, that is, at a point prior to July 2005. Page 14 of the 2005 Idea Book is headed "Pet-friendly Plants." The copy was written by plaintiff based on information she found regarding the correlation between gardeners and pet owners. The concept was presented to Dirks and approved by him. The page suggests using containers to keep fragile flowers out of harm's way from heavy paw traffic and to use rugged perennials where there is pet traffic. It specifically mentions one plant that is

fragile and needs to be protected from cats and a specific plant that is rugged enough to generally avoid damage from dogs.

Another paragraph in the PW 2005 Garden Idea Book contains references to the Humane Society and the American Society for the Prevention of Cruelty to Animals ("ASPCA") as website sources for information regarding "plants that can be harmful to pets."[3]

The 2006 and 2007 PW Idea Books had similar pages entitled "Pet-friendly Plants" and "A Pet-Friendly Environment," including the same paragraph referencing the Humane Society and ASPCA websites. Below a picture of a dog next to an Osteospermum, the 2008 PW Idea Book stated: "Osteospermums are not harmful to pets. For a list of other pet-friendly plants, visit" PW's website. The "Paws in the Garden" section included a reference to visiting PW's website for a list of plants "that can be harmful to pets." The word "nontoxic" or "toxic" is not used in defining or otherwise referring to pet-friendly plants.

_____

[3] Currently, the ASPCA website lists numerous plants that are toxic and non-toxic to pets, including dogs, cats, and horses. *See* http://www.aspca.org/pet-care/animal-poison-control/toxic-and-non-toxic-plants. The Humane Society website lists plants potentially poisonous to pets. *See* http://www.humanesociety.org/assets/pdfs/pets/poisonous_plants.pdf.

Evidence supports that the term Pet-Friendly appeared on PW's website beginning in 2005 and was used to describe certain plants. The PW website allowed consumers to search for plants with particular attributes. Pet-friendly was not a searchable attribute until early 2008. It remained so until April 2012. On PW's website, pet-friendly was defined as "plants that are unlikely to be harmful for pets." As of June 2009, though, it was defined as "plants not toxic to pets." That definition was removed following a complaint from plaintiff. Plaintiff does not explain the distinctions in meaning between being "not toxic" and "not harmful." She is not claiming any trademark in the precise phrases. The word "toxic" has a Latin origin meaning poison. *Webster's Ninth New Collegiate Dictionary* 1248 (1988).

In 2008, PW Program Director Kerry Meyer determined which plants to designated as pet-friendly on the PW website. She did this, in part, based on an article entitled "Better Pet-Safe Than Sorry: Ten Easy, Colorful, Non-Toxic Plants" that was authored by plaintiff. It states, as a caption: "PROVEN WINNERS AND THEIR COLLECTION OF REGIONAL FAVORITES, PROVEN SELECTIONS, HAVE SEVERAL PET SAFE PLANTS FOR CALIFORNIA GARDENS . . . ." The article was written in 2006 and originally

published by Armstrong Garden Center.  It was added to PW's website in late 2006, which is where Meyer found it.

In July 2005, plaintiff, Walder, and PW's Dirks had a meeting.  Plaintiff suggested to Dirks that PW market a line of pet-friendly plants.  Plaintiff did not ask either of them to sign a written confidentiality agreement, but did orally ask them to keep the idea confidential.

Within a few months thereafter, following Dirks's suggestion to Schneider that he meet with plaintiff, plaintiff met with Schneider in Illinois, again suggesting marketing a line of pet-safe plants.  Plaintiff suggested doing independent testing of plant toxicity.  During these discussions, Schneider informed plaintiff that the standard royalty rate is 2¢ per plant.  Plaintiff thought that was low, but did not reject it.

On November 28, 2005, Schneider sent plaintiff an e-mail proposing a "partnership" with Amerinova.  It stated:

> I wanted to get you an email spelling out how a partnership with Amerinova could be beneficial to you on your Pet Safe Plants Line.
>
> Here are the relevant facts:

- Amerinova represents many plant breeders around the world and so we have a variety of plants that can be used in new brands such as Pet Safe.
- We can direct breeders to select for certain traits that will be conducive to their inclusion in specific marketing programs
- Working through EuroAmerican as our production company, we can make available to the greenhouse industry an assortment of branded plants, tags, POP and other marketing materials.
  - Display at California Pack Trials and Eastern Performance Trials
  - Display at OFA Short Course in Columbus, Ohio
  - Displays at consumer garden and pet shows
  - Advertisements in trade magazines
- In order to pay you for your idea and work, Amerinova will pay you $.02 per plant sold under the marketing plan for Pet Safe Plants
- Amerinova can license other growers to make sure there is geographical coverage of the entire US and Canada as well as licensing partners in Europe and Australia.
- Amerinova can work with you and EuroAmerican to develop the appropriate photography for the line
- Amerinova can work with you to generate positive press and PR
- Amerinova can work with EuroAmerican to grow finished material for you to sell online

We are all very excited about your ideas and see the enormous potential in the worldwide market for them. We would like to work with you to launch the Brand at the pack trials in April 2006 with the first sale of plants coming in August 2006 to growers and sales at Retail following 1-2 months later to allow for cultivation time.

Let me know what else we need to do for me to draw up an
agreement.

Schneider intended any agreement with plaintiff to be with Amerinova, which

would then enter into a licensing agreement with Euro. Schneider viewed the

negotiations as a multi-step process.

On February 23, 2006, plaintiff and her business partner Edra Scofield

met with, Amerinova's and Euro's owners Rader and Church and two Amerinova

employees, Schneider and administrative assistant Birdie Lenard-Fountain, in

California to present plaintiff's idea. Prior to the meeting, plaintiff required each to

sign a non-disclosure and confidentiality agreement identifying each a s

representatives of Amerinova. Each of the confidentiality agreements identifies

the particular Amerinova representative as having "principal offices at Amerinova

Properties." The confidentiality agreements are dated February 7, 2006 and were

drafted by plaintiff.

At the February 23 meeting, a 2¢ per plant royalty payment by

Amerinova for plants labeled "pet safe" was acceptable to both sides. A genuine

factual dispute exists as to whether a distinct and separate oral agreement was

reached to pay that amount or whether other issues had to first be resolved before

the royalty would be part of any agreement. On defendants' motions, the factual dispute must be resolved in plaintiff's favor. The evidence, however, only supports the existence of an oral agreement to pay plaintiff a 2¢ royalty for plants sold as "pet safe." The evidence does not support that any agreement was reached regarding a broader "Marketing Concept" involving licensing or testing for toxicity. The evidence only supports that any agreement that was reached was an agreement with Amerinova. Amerinova would still enter a licensing agreement with PW, Euro, and/or others to produce, distribute, and sell particular plants as pet friendly or pet safe.

In early April 2006, Rader sent plaintiff a letter on Amerinova letterhead advising plaintiff of changes at Amerinova, particularly noting that Schneider had left the company. It was also noted that Amerinova was expanding the companies with which it would offer licensing opportunities. In the closing paragraph, Rader stated "We look forward to working with you more closely and creating a stronger partnering relation with you." Handwritten on the letter and separately signed was: "Susan, I love your pet safe plants idea and want to work with you to make it happen."

Subsequently, on April 24, 2006, plaintiff sent an e-mail to Rader, with copies to Jens Mart (Schneider's replacement) and Fountain, stating:

> Although I have every intention of partnering with Euro/Amerinova on PetSafePlants, this is to let you know that I am contacting non-PW propagators/growers and soliciting freelance writing projects. This is strictly due to my financial situation. Since I quit working with Ron in July, my income has been substantially reduced and it's a matter of no margin, no mission at this point.

> Should I be asked to work for other companies, please be assured that I will keep any information I may have about Euro in strictest confidence. Once PSP is up and running, I will of course devote all my time and energy to making it successful.

Plaintiff points to no specific evidence of work conducted thereafter that was devoted to a project with defendants.

There is no evidence that, during or subsequent to the 2005 and 2006 discussions with plaintiff, plaintiff ever provided defendant with a list of pet-friendly plants nor did she conduct or cause to be conducted any testing of plants' toxicity to pets. Plaintiff represented to Amerinova that Dr. Kurt Beaumont, Dr. Robin Hadley, and Dr. Val Beasley were acting as medical experts and consultants for her pet-safe plants concept. Each denied any involvement in plaintiff's marketing concept as a medical consultant or in any other role.

After Schneider left Amerinova, he and plaintiff introduced her pet-safe plant concept to other persons and firms. In October 2006, plaintiff and Schneider met with a representative of Floragem, a competitor of Amerinova. The conversations included discussions of royalty rates. Schneider also met with two other firms on behalf of plaintiff.

The only evidence of an alleged breach of the 2¢ royalty promise is the use of the characteristic Pet-Friendly on a number of Proven Winner labels by PW between 2008 and 2012, long after plaintiff's negotiations with Amerinova ended.

## B. Joint Venture and Agency Contentions

Plaintiff contends that the relationship between the three members of Proven Winners was in reality a joint venture which she describes as the Proven Winners Joint Venture or PWJV. She describes Amerinova and each of the members of PW as an agent of the joint venture. Demonstrating the existence of a joint venture requires proof of "(1) a community of interest in the purpose of the joint association, (2) a right of each member to direct and govern the policy and conduct of the other members, and (3) a right to joint control and management of the property used in the enterprise." ***Romanek v. Connelly***, 324 Ill. App. 3d 393, 753 N.E.2d 1062, 1072 (1st Dist. 2001); *see also **O'Brien v. Cacciatore***, 227 Ill.

App. 3d 836, 591 N.E.2d 1384, 1389 (1st Dist. 1992); *Restatement (Second) of Torts*, § 491 cmt. c (1965). Plaintiff contends that she joined the PW joint venture in February 2006.

There must be clear evidence of intent to form a joint venture. *See **Riverdale Bank v. Papastratakos***, 266 Ill. App. 3d 31, 639 N.E.2d 219, 225-26 (1st Dist. 1994); ***Milstine v. Achler***, 133 Ill. App. 2d 273, 273 N.E.2d 233, 237 (1st Dist. 1971). The evidence is to the contrary. PW was organized as a limited liability company with a limited objective by parties in competition with each other. It is not a partnership or joint venture. The owner-members are governed by an operating agreement under which no single partner can control operations. There is no evidence that PW (or each of its members) or Euro ever manifested an intent to form a joint venture with plaintiff. *Cf. **Brien***, 591 N.E.2d at 1389-90. Plaintiff points to no evidence that would warrant ignoring the limited liability status of the defendants or treating their relationship as a joint venture in which the acts of one party are binding on all parties.

There is no evidence to support that Amerinova was authorized to enter into contracts for PW or Euro. A corporate relationship between separate legal entities does not create an agency relationship. ***Zurich Am. Ins. Co. v. Watts***

*Indus., Inc.*, 417 F.3d 682, 687-88 (7th Cir. 2005). Indeed Schneider, who dealt with plaintiff, testified that he ordinarily did not have authority to contract for Euro or Amerinova until any agreement was approved by Church or Rader.

## C. Contract Claims (Counts I & II)

Counts I and II are contract claims against both defendants.

Considering first the Count II Marketing Concept claim, the evidence does not support that anyone entered into a marketing contract on behalf of Euro or PW. Amerinova and the plaintiff never completed negotiations. It is also clear that there was never any performance by plaintiff. Plaintiff's conduct after April of 2006 is only consistent with the fact that she was not bound, and did not consider herself bound, by any contract with Amerinova, Euro, or PW.

Also, plaintiff points to no evidence of breach of the marketing concept. PW's use of the term Pet-Friendly on some of its labels was not shown to be based on a scientific or other analysis of the toxic or poisonous quality of plants. It was not different from data contained in its earlier Garden Idea Books or plant quality data available on the ASPCA or Humane Society databases which were used by PW employees to develop labels.

As to Count I, evidence does support the contention that plaintiff reached an oral agreement with Amerinova for the 2¢ per plant royalty (albeit for the use of the term Pet-Safe). The issue is whether that should also be considered to be a contract with one or both defendants and, if so, whether it was an enforceable oral contract breached by either Euro or PW.

Under Illinois law,[4] the elements of a breach of contract claim are: "(1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) resultant damages." *Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 764 (7th Cir. 2010) (quoting *W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 351 Ill. App. 3d 752, 814 N.E.2d 960, 967 (1st Dist. 2004)). The burden is on plaintiff to establish each essential element of her breach of contract claim. *HSBC Mortg. Servs., Inc. v. Brightgreen Home*

---

[4]In opposing defendants' summary judgment motions, plaintiff indicates California law may apply to some issues, but does not rely on or cite any. *See* Pl. Answer Br. [D/E 182] 11 n.7 ("Throughout her brief, Ms. Spitz refers to Illinois law (and not California law) for efficiency as both are similar for the issues raised on summary judgment."). It will be assumed that either Illinois law applies to all issues or California law would be the same. *See Morisch v. United States*, 653 F.3d 522, 530 (7th Cir. 2011). The statute of limitations and other affirmative defense issues raised in plaintiff's own summary judgment motion need not be reached in today's ruling so no opinion is expressed regarding whether plaintiff adequately preserved and raised California law issues regarding any affirmative defense issues.

*Loans, Inc.*, 2011 WL 2149082 *2 (N.D. Ill. May 31, 2011). To the extent plaintiff is relying on defendants' obligation to honor the contract being based on attributing Schneider's and Amerinova's conduct to defendants, it is plaintiff's burden to establish those connections as part of her burden of proving her contract claim.

While plaintiff makes contentions as to irregularities in the parties acting as separate and distinct entities and points to some evidence of irregularities in Euro and Amerinova being conducted as separate and distinct business entities,[5] plaintiff makes no legal arguments as to piercing a corporate veil. Instead plaintiff bases defendants being obligors under the oral contract on four possible theories: (a) distinct from PW itself, PW and its three members were a joint venture that contracted with plaintiff; (b) PW and Euro were agents of each other; (c) Amerinova is a division of Euro and/or agents of each other; and (d) Schneider had actual or apparent authority to act on behalf of Euro.

The last theory is a nonissue. There is no evidence to support that, during the pertinent time period, Schneider had authority to act on behalf of Euro. There is contested evidence regarding Schneider's authority to enter into contracts

---

[5]Evidence does not support irregularities in the conduct of PW's business.

on behalf of Amerinova.  As previously discussed, evidence supports that an oral

contract with Amerinova to pay a royalty existed so Schneider's authority to act

need not be discussed further.

Plaintiff contends Amerinova is a division of Euro and so bound Euro.

As part of this argument plaintiff asserts:  "[T]he record firmly establishes that

Amerinova was no more than a division of EURO with no true identity of its own

apart from EURO."  Pl. Answer Brief [D/E 182] 8-9.  Footnote 6 at the end of this

sentence states:  "*See* law on Alter Ego cited by Defendants.  (*See* d/e 135

pp. 1-2)."  Then follows a recitation of various purported facts about the

relationship between Amerinova and Euro.  *Id.* at 9.  Plaintiff makes no attempt to

place these facts within the framework of alter ego law.  To the extent plaintiff is

actually raising an alter ego contention, it is not sufficiently supported by legal

argument and therefore is waived.  *See Griffin v. City of Milwaukee*, 74 F.3d 824,

828 (7th Cir. 1996); *Pelfresne v. Vill. of Williams Bay*, 917 F.2d 1017, 1023 (7th

Cir. 1990); *Gold v. Wolpert*, 876 F.2d 1327, 1333 (7th Cir. 1989).  Under Illinois

law, failure to follow corporate formalities is not by itself a basis for holding a

member liable for an LLC's debts.  805 ILCS 180/10-10(c); *Westmeyer v. Flynn*,

382 Ill. App. 3d 952, 889 N.E.2d 671, 678 (1st Dist. 2008).  Plaintiff does not

show undercapitalization of Amerinova or a mere facade. Occasionally referring to a distinct LLC as a division does not make Euro a party to Amerinova's contracts. Plaintiff does not state facts or make a sufficient legal argument as to alter ego or piercing the corporate veil. Amerinova's own conduct, by itself, does not make Euro a party to Amerinova's conduct nor make it liable for Amerinova's conduct.

The claim that PW was a party to a contract or joint venture with plaintiff rests largely on the fact that Rader and Church own Euro and Euro is a member or one-third owner of PW. This contention is a veil-piercing argument unsupported by any facts which would support ignoring that PW is a separate entity and ignoring the limitations of the PW operating agreement which precludes Euro (or Rader and Church on behalf of Euro) from acting to bind PW to plaintiff's marketing concept or royalty payments without the approval of the other two PW members.

At most, plaintiff has shown that she had a contract with Amerinova. She has not shown that a contract with Amerinova can be attributed to Euro as well or directly to PW. Evidence does not support that, after plaintiff contracted with Amerinova, Amerinova then entered into a license agreement with Euro to

propagate pet-friendly plants or with PW to market pet-friendly plants. The Count I contract claim will be dismissed.

### D. Breach of Fiduciary Duty (Count III)

Defendants do not dispute that a joint venture can create fiduciary relationships between its members. The evidence, though, does not support that plaintiff was a member of a joint venture. Therefore, defendants had no fiduciary duty to plaintiff that could have been breached. Count III will be dismissed.

### E. Breach of Confidentiality (Counts IV & V)

Citing *Despot v. Combined Ins. Co. of Am.*, 2004 WL 1088361 *3 (N.D. Ill. May 12, 2004), Euro contends Illinois does not recognize a common law claim for breach of confidentiality. That case, which involved a motion to dismiss a *pro se* 29-count complaint, cites no case law supporting this holding. However, the only cases this court has found are those recognizing a common law breach of confidentiality claim based on disclosure of a trade secret, generally an employee disclosing a trade secret of an employer. *See, e.g.*, *PepsiCo, Inc. v. Redmond*, 1996 WL 3965 *27 (N.D. Ill. Jan. 2, 1996) (collecting cases). Contrary to plaintiff's contention, *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1271-72 (7th Cir. 1995), does not hold that there is a common law breach of confidentiality claim

that does not require a trade secret. In any event, what plaintiff characterizes as confidentiality claims are primarily contract claims. She claims violations of the written nondisclosure agreements signed by the Amerinova representatives in February 2006 and an oral confidentiality agreement with Dirks of PW from the July 2005 meeting. Plaintiff also contends that, based on a course of conduct, there was an understanding of confidentiality with Schneider. In any event, regardless of the exact parameters of confidentiality claims under Illinois law, plaintiff's confidentiality claims fail because she has not shown any confidentiality agreement was violated.

Plaintiff refers to her Marketing Concept being disclosed, but the only evidence she points to as a disclosure is PW's use of pet-friendly on its website. Prior to the July and Fall 2005 meetings with Dirks and Schneider, plaintiff, as a PW consultant, had written copy for the 2005 Garden Idea Book that referred to plants that were harmful to pets. That and subsequent Idea Books referred to such plants as pet-friendly. Plaintiff does not contend that PW lacked authority to include such language in its Idea Books. Moreover, in 2006, plaintiff wrote and published an article that listed pet-friendly plants. PW reproduced that article on its website and plaintiff does not contend that was impermissible. In 2008, when

PW started using pet-friendly on its website as a searchable attribute (using the published article as a guide), PW was not using confidential information. Moreover, plaintiff made little or no effort to maintain any confidentiality. Plaintiff has not shown a violation of confidentiality. Counts IV and V will be dismissed.

### F. Trade Secrets (Count VI)

In Illinois, a trade secret claim is a statutory claim governed by the Illinois Trade Secrets Act ("ITSA"), 765 ILCS 1065. The elements of a trade secret claim are: "(1) a trade secret existed; (2) the secret was misappropriated through improper acquisition, disclosure, or use; and (3) the owner of the trade secret was damaged by the misappropriation." *Stevens v. Interactive Fin. Advisors, Inc.*, 2012 WL 6568236 *3 (N.D. Ill. Dec. 17, 2012) (quoting *Parus Holdings, Inc. v. Banner & Witcoff, Ltd.*, 585 F. Supp. 2d 995, 1005 (N.D. Ill. 2008)). ITSA defines a trade secret as: "information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that: (1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can

obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality." 765 ILCS 1065(d). Information that is generally known within an industry, even if not in the public at large, as well as information that can be readily duplicated without considerable time, effort, or expense, is not a trade secret. ***Von Holdt v. A-1 Tool Corp.***, 2013 WL 53986 *7 (N.D. Ill. Jan. 3, 2013).

As with the confidentiality claims, plaintiff does not point to defendants' use of the purported trade secrets other than having the pet-friendly attribute on PW's website. That was based on public information, not any trade secret. Also, plaintiff does not provide evidence supporting that she developed and provided to PW a list of pet-friendly plants that was more than what could be readily duplicated from public sources. Count VI will be dismissed.

## G. Quasi-Contract Claims (Counts VII & VIII)

Plaintiff's remaining two claims are for *quantum meruit* and unjust enrichment. Both claims are based on an implied contract in law and require a showing "that valuable services or materials were furnished by the plaintiff [and] received by the defendant, under circumstances which would make it unjust for the defendant to retain the benefit without paying." ***Stark Excavating, Inc. v. Carter***

*Constr. Servs., Inc.*, 2012 IL App (4th) 110,357, 967 N.E.2d 465, 474 (2012)

(quoting *Hayes Mech., Inc. v. First Indus., L.P.*, 351 Ill. App. 3d 1, 812 N.E.2d

419, 426 (1st Dist. 2004))  "Notably, even when a person has received a benefit

from another, he is liable for payment 'only if the circumstances of its receipt or

retention are such that, as between the two persons, it is unjust for him to retain it.

The mere fact that a person benefits another is not of itself sufficient to require the

other to make restitution therefor.'"  *Hayes*, 812 N.E.2d at 426 (quoting *Rutledge v.*

*Hous. Auth. of the City of E. St. Louis*, 88 Ill. App. 3d 1064, 411 N.E.2d 82, 86

(5th Dist. 1980) (quoting *Restatement of Restitution* § 1 cmt. c (1937))).

Euro contends these claims are preempted by ITSA and both defendants

contend plaintiff did not provide them with uncompensated, valuable services.

Plaintiff was compensated for the work she did for PW's 2003 and 2005

Gardener's Idea Books.  The 2005 Book included a reference to independent

websites that listed "plants that can be harmful to pets."  The term "Pet-friendly

Plants" already appeared on the same page.  Continuing this theme in further Idea

Books and on PW's website and amplifying it with publicly available information

did not require that plaintiff be further compensated.  It is true--at least for

purposes of ruling on defendants' summary judgment motions--that Amerinova had

agreed to pay plaintiff a 2¢ per plant royalty for licensing pet-friendly plants. Amerinova, however, never licensed that concept to Euro, PW, or any other entity in the plant production or distribution business. Even if it can be inferred from this fact that plaintiff's idea had value, evidence does not support that PW relied on work of plaintiff--other than that previously paid for and plaintiff's publicly available article--in designating pet-friendly or non-harmful plants. Plaintiff has not shown that she provided valuable services that were not compensated. Counts VII and VIII will be dismissed.

## IV. CONCLUSION

Defendants are entitled to summary judgment dismissing plaintiff's cause of action in its entirety. Therefore, it is unnecessary to consider plaintiff's summary judgment motion regarding defendants' affirmative defenses.

IT IS THEREFORE ORDERED that defendants' and plaintiff's motions to strike [161, 167, 182] are granted in part and denied in part. Defendants' motions for summary judgment [134, 141] are granted. Plaintiff's motion for summary judgment [137] is denied without prejudice. The Clerk of the Court is

directed to enter judgment in favor of defendants and against plaintiff dismissing

plaintiff's cause of action with prejudice.

ENTER:


_____
UNITED STATES DISTRICT JUDGE


DATED:  AUGUST  22, 2013